2018 IL App (3d) 150674

Opinion filed October 12, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-15-0674 Circuit No. 13-CF-848 |
| | ) | |
| LAVAIL W. DUNBAR, | ) ) | The Honorable Walter D. Braud, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Justice Schmidt concurred in the judgment and opinion.
Presiding Justice Carter dissented, with opinion.

**OPINION**

¶ 1     After a jury trial, defendant, Lavail W. Dunbar, was found guilty of first degree murder

(720 ILCS 5/9-1(a)(2) (West 2012)) and aggravated battery of a child (720 ILCS 5/12-3.05(b)(1)

(West 2012)). Defendant was sentenced on the first degree murder charge only and was

sentenced to 30 years in prison. Defendant appeals, arguing that (1) he was not proven guilty of

either offense beyond a reasonable doubt, (2) the trial court failed to comply with Illinois

Supreme Court Rule 431(b) (eff. July 1, 2012) when it questioned potential jurors during

*voir dire*, (3) his trial counsel was ineffective for failing to move to redact certain portions of the

video recording of defendant's police interview, and (4) the trial court erred in admitting certain hearsay statements of defendant's girlfriend (the victim's mother) under the medical treatment exception to the hearsay rule and in instructing the jury that it could consider those statements as substantive evidence.

¶ 2                                    I. BACKGROUND

¶ 3         On September 18, 2013, at about 4:13 a.m., police officers were dispatched to an apartment in Rock Island, Illinois, in response to a call of an infant not breathing. Upon arrival at that location, officers saw defendant, the 20-year-old boyfriend of the infant's mother, giving cardiopulmonary resuscitation (CPR) to the infant, J.M., on the living room floor. J.M.'s forehead was swollen and bruised, his eyes were puffy and swollen, and his diaper was full. J.M. was not moving, was unresponsive, and had no pulse. J.M.'s mother, Leila Martin, and at least four other people were present in the apartment at that time. Defendant told the police that he had fed J.M. while Martin was in the bathroom and had put J.M. to bed at about 4 a.m. Defendant was performing CPR incorrectly, so a police officer took over until the paramedics arrived. After efforts to revive J.M. at the scene failed, the paramedics took J.M. and Martin to the hospital by ambulance, and a police officer took defendant to the hospital in a police car. During the car ride, there was no conversation between defendant and the police officer. Defendant seemed calm, did not show any emotion, and did not say a word.

¶ 4         When the ambulance arrived at the hospital, J.M. was in full cardiac arrest, had no pulse, and was not breathing. It was immediately apparent to the emergency room staff members that J.M. had injuries to his head and face. J.M.'s head was swollen, misshapen, and bruised, and his body was pale, gray, and cold. The emergency room staff tried to revive J.M., but they were unable to do so, and J.M. passed away. J.M. was only about four months old at the time. A nurse

examined J.M. further for charting purposes and saw that J.M. had bruising and swelling over and around both eyes; that the left side of his head behind his ear was bruised and swollen and felt soft, mushy, and not normal; that he had bruises under his jaw line; and that he had bruises on his legs. When the nurse removed J.M.'s diaper, she saw that there was some liquid stool in the diaper and a baby wipe that had some stool on it, which she thought was odd. The diaper also had a tiny bit of blood on it in one section. The nurse noticed that J.M.'s anus had two superficial fissures (areas where the skin had split open) and a full thickness tear that went through all the layers of his skin in the diaper area. In total, it took the nurse over an hour to document all of J.M.'s injuries. As the nurse was doing so, the bruising to J.M. became more prevalent. The nurse noticed that J.M. also had an injury on the right side of his head behind his ear and that there was bruising and swelling in that area as well. The doctor who had treated J.M. observed many of the same injuries. The doctor diagnosed J.M. as having cardiopulmonary arrest, acute head injury, anal fissures, and traumatic bruising in several locations.

¶ 5    While they were at the hospital, defendant and Martin were kept separate. The police placed defendant into an unlocked consultation room and stood outside the room. When a police officer checked on defendant, defendant had his head down and was sleeping. Defendant slept from about 4:30 or 4:45 a.m. to about 7 a.m. After the hospital staff told Martin that J.M. had died, the police asked defendant to accompany them to the police station. Defendant agreed. During the car ride to the police station, there was no conversation between defendant and the police officer, and defendant did not ask the officer any questions. When they arrived at the police station, as they were walking to the back entrance door, defendant asked the police officer if they were able to get the baby breathing. The officer responded that they were not. Defendant did not ask any further questions, and the officer placed defendant in an interview room.

¶ 6        Prior to conducting an interview, the police officers obtained some background information on defendant and Martin. The officers learned that defendant was 20 years old, 5 feet, 10 inches tall, and that he weighed 160 pounds, and that Martin was 5 feet, 2 inches tall, and weighed 114 pounds. At the outset of the interview, defendant was read, and waived, his *Miranda* rights and indicated that he was willing to speak to the police officers. The waiver of rights form indicated that defendant had not completed high school and that his highest grade of completion was the tenth grade. Defendant told police that he arrived at the apartment at about 10 p.m., watched some television with J.M., fed J.M. a bottle, and put J.M. in his crib. J.M. was not fussy or in distress at that time. Defendant and Martin watched a couple of movies, and defendant made a pizza. Defendant checked on J.M. again at about 2 or 3 a.m. and gave J.M. another bottle. No one other than defendant and Martin were in the apartment at that time. J.M. drank the bottle and fell asleep. About a half hour later, Martin checked on J.M., found that J.M. was not breathing, and alerted defendant. Defendant gave J.M. mouth-to-mouth resuscitation until the ambulance arrived. At one point in the interview, when one of the officers asked defendant to guess how J.M. might have been injured, defendant stated that maybe J.M. had hit his head somehow. As the interview progressed, the officers became more aggressive in their interview tactics. At no point, however, did defendant admit that he had committed or taken any part in the commission of the offenses, despite the police officers trying various interview techniques. The officers tried to get defendant to state that Martin had killed J.M., accused defendant of the crime, and told defendant that when the pictures of the dead infant would be shown, a jury would not believe defendant and would find that both defendant and Martin were responsible for the baby's death.

¶ 7 An autopsy was conducted on J.M., and it was determined that the cause of J.M.'s death was blunt trauma to the head. The autopsy showed that J.M. had extensive hemorrhage (a large discharge of blood) under his scalp, multiple skull fractures, hemorrhage in several areas of his brain, and a tear to his anus. Due to the hemorrhage beneath his scalp, J.M. had a purple discoloration on the front side of his head that went from his hairline down to his upper eyelids and around both ears. On the right side of J.M.'s head toward the rear was a depressed skull fracture where a flap of bone had been pushed in and was pressing against J.M.'s brain. On the left side of J.M.'s head there were multiple fractures, including one that left a free-floating piece of bone. In the forensic pathologist's opinion, the injuries to J.M.'s head could not have been accidental because there were too many fractures in different areas of J.M.'s skull and too much hemorrhage under J.M.'s scalp. Although the forensic pathologist had conducted over 5000 autopsies in his career, he had never seen a hematoma (an enclosed collection of blood) in an infant as deep as the one he found on the top of J.M.'s scalp and had only seen one that deep in an adult a "handful" of times. Depressed skull fractures, complex skull fractures, and extensive hemorrhage under the scalp were not consistent with accidental injuries.

¶ 8 Shortly after J.M.'s death, defendant was charged with first degree murder and with aggravated battery of a child in the instant case. The charging instrument for both offenses included accountability language, stating that defendant had committed the offenses "while acting with another for whose conduct he [was] legally accountable."

¶ 9 Defendant's case proceeded to a jury trial in January 2015. Prior to the jury selection process, the trial court asked the prosecutor and the defense attorney whether the charges were correct. The prosecutor responded affirmatively. There is no indication in the record that defense counsel made any response.

¶ 10        During the jury selection process, the trial judge asked the entire panel of potential jurors the Supreme Court Rule 431(b) questions as follows:

"THE COURT: Thank you. Do you understand and accept that a person accused of a crime is presumed to be innocent of the charge against him, that that presumption of innocence stays with the defendant throughout the trial. It is not overcome unless from all the evidence you believe that the State proved his guilt beyond a reasonable doubt. In other words, do you understand this means that the State has the burden of proving the defendant's guilt beyond a reasonable doubt? The defendant does not have to prove his innocence? The defendant does not have to present any evidence on his own behalf? Does everyone agree without reservation to these propositions of law? If so, please raise your hand.

(All jurors raise their hand.)

THE COURT: Thank you. You understand that this means that the defendant does not have to testify if he does not wish to? That if he does not testify you may not use it against him? That if he does testify you will weigh his testimony the same as you would any other witness? If you agree with these propositions of law, please raise your hand.

(All jurors raise their hand.)"

Defendant did not object to the trial court's Rule 431(b) questions.

¶ 11        During its case-in-chief, the State presented the testimony of the police officers who responded to the emergency call, the paramedics who treated J.M., some of the hospital emergency room staff members who treated J.M., the forensic pathologist who conducted the

6

autopsy, and one of the police officers who interviewed defendant. From those witnesses, the State elicited most or all of the factual information set forth above.

¶ 12    Over defendant's objection, the trial court admitted several statements that the mother, Martin, had made to various medical providers that she found J.M. not breathing about 15 to 20 minutes after defendant fed J.M. and changed J.M.'s diaper and that she had noticed at that time that J.M.'s head was bruised and swollen. One of those statements was made after J.M. had been declared dead by the emergency room physician. Martin also stated to medical staff members that (1) J.M.'s head was normally very large, (2) medical staff members at a clinic she had taken J.M. to a few days earlier for diaper rash were worried about J.M.'s head being large and kept measuring the size of J.M.'s head, (3) sometimes J.M.'s head seemed soft, (4) on the evening/morning of the incident, she had been checking on J.M. every 15 to 30 minutes throughout the night, and (5) when defendant fed and changed J.M. shortly before Martin found J.M. not breathing, Martin could see defendant through the doorway caring for J.M., and J.M. was smiling, playful, and happy. Initially, at defendant's request, the trial court gave the jury a limiting instruction that the statements were not being offered for the truth of the matter asserted but for the purpose of making a medical diagnosis or treatment or to explain the medical person's actions. However, the trial court later *sua sponte* instructed the jury that it was incorrect in its previous instruction and that the statements were fully admissible as a matter of proof because the statements were not hearsay.

¶ 13    The State also presented the testimony of the family practice physician, Dr. Blechle, who treated J.M.'s diaper rash at a family clinic on September 15, 2013. In addition to diaper rash, Martin told staff members at the family clinic that J.M. was also suffering from diarrhea. Dr. Blechle examined the area where the infant's diaper rash was located and found this area to be

red and irritated. Dr. Blechle explained that during the examination on September 15, 2013, J.M. was crying because the diaper rash was painful. Although the doctor typically prescribed only an antifungal cream for diaper rash, in this case, Dr. Blechle also prescribed a steroid cream because the "area was so irritated." Martin received instructions to apply both creams to the affected area three times a day.

¶ 14   Dr. Blechle did not observe any signs that J.M. had been abused or neglected during the visit on September 15, 2013. When the doctor was shown at trial some of the photographs that were taken after J.M.'s death, the doctor stated that at the clinic, J.M.'s head and anus did not look like they did in the photographs. At the time of the clinic visit, J.M.'s head was not bruised or swollen, and J.M.'s anus did not have any tears or fissures, although it was red and inflamed. In the doctor's opinion, if urine or feces permeated into those fissures or tears or into the diaper rash itself, it would be irritating and painful for J.M.

¶ 15   In addition, the State presented the testimony of a police officer who searched the apartment after J.M.'s death. The officer found several baby outfits (onesies) with dark brown stains and crusty material on them in the diaper area and blankets with similar stains and material.

¶ 16   Along with the testimony presented, the court allowed the State to admit photographs depicting the condition of J.M.'s body, various stages of the autopsy, and stained baby outfits and blankets. The State's evidence also included the outfits and blankets depicted in the photographs, both medications prescribed for J.M.'s diaper rash, the instructions for those medications, and the video recording of defendant's police interview, which the jury was allowed to watch.

8

¶ 17    After the State rested its case, the defense moved for a directed verdict, noting the theory of accountability that the State had alleged and arguing that defendant's mere presence at the scene was not enough to sustain a conviction. The trial court denied the motion. Defendant did not testify. After the defense rested, the jury was instructed, and closing arguments were made.

¶ 18    In the State's closing argument, the prosecutor told the jury that defendant battered J.M. and that Martin was right there with defendant when defendant did so. As a motive for the crimes, the prosecutor suggested that defendant and Martin were frustrated because J.M. was "screaming his head off" at 4 a.m., due to the pain from the diaper rash, which defendant and Martin had allowed to get much worse; that defendant "lost it"; and that defendant battered J.M. to "silence" him. The prosecutor commented that what defendant and Martin told medical treatment providers—that J.M. was normal and fine—was not possible and that Martin would not have been checking on J.M. every 15 to 20 minutes at 4 a.m. if J.M. was a normal, healthy child who was laughing and playful. The prosecutor pointed out that J.M. was not defendant's child and that defendant appeared unemotional and unconcerned after the incident occurred. The prosecutor suggested further that defendant and Martin must have talked before calling 9-1-1, so they could make sure that enough of their stories lined up.

¶ 19    Defense counsel in closing argument told the jury that Martin and defendant were two "young kids" with a baby, trying their best; that a doctor had seen J.M. a few days earlier and saw no indication of neglect; and that Martin had told police that she could see defendant from the bedroom when defendant was giving J.M. a bottle and was putting J.M. down to sleep. According to Martin, defendant was very appropriate; Martin saw J.M. later, and he was smiling and happy; Martin was the last person to be with J.M.; Martin could have battered J.M. while defendant was in the other room, without defendant knowing what had happened; the State had

9

to prove beyond a reasonable doubt that defendant was either accountable for the crime or that he actually committed the crime[1]; and the mere fact that defendant was present in the apartment was not enough evidence to convict defendant. More specifically as to the video recording of the police interview, defense counsel stated:

"They take him down to the police station and leave him there after he has been there, and they use all of their techniques that they can use. They are more educated. They are more experienced. They have read books. They know how to put the person where they do, try the games that they think they can do so that they will try to get information which they believe is true. Listen to that. My client didn't get up in their face. He kept on saying, 'I don't know.' 'I don't know.' They asked him about hypothetical [*sic*] and maybe this, but 'I don't know.'

Now, he's—has a tenth-grade education. They tried to break him down. He's not some con artist. He did that because he was being forthright and truthful."

Defense counsel also stated:

"I think you saw the interview. I think you see it completely different than the State. I do. I see someone there that was, for a 20-year-old kid, pretty good. And I do not see that the State has proven its case as they say, that my client stood over the crib and pounded [J.M.'s] head, while [Martin] sat there silently. And [Martin] has never said anything about that."

¶ 20    After closing arguments had concluded and deliberations had taken place, the jury found defendant guilty of both charges. Defendant filed a *pro se* posttrial motion, alleging ineffective

---

[1]Defense counsel's exact words were: "[The State] [had] to prove beyond a reasonable doubt that [defendant] either abetted—either was accountable or that he actually did it, and they have to prove that beyond a reasonable doubt."

assistance of counsel, which the trial court later denied, after questioning defendant about his claims of ineffective assistance.

¶ 21 Following a sentencing hearing, the trial court sentenced defendant on the first degree murder charge only and sentenced defendant to 30 years in prison. In doing so, the trial court stated, in part:

> "And Mr. Dunbar, the State charged you as a—in accountability because you never took accountability. You never stood up and said I did it and neither did Ms. Martin, so they had no choice but to try you as accountability. But it was clear to the jury in the presentation by the State who they thought did it and it's clear to me who did it. I don't have any doubt in my mind."

Defendant appealed without filing any other posttrial motions.

¶ 22                                    II. ANALYSIS

¶ 23 On appeal, defendant argues that (1) he was not proven guilty of first degree murder and/or aggravated battery of a child, as alleged in the charging instrument, beyond a reasonable doubt, (2) the trial court failed to comply with Supreme Court Rule 431(b) when questioning prospective jurors during *voir dire*, (3) defense counsel was ineffective for failing to move to redact certain portions of the video recording of defendant's police interview, and (4) the trial court erred by admitting certain hearsay statements of J.M.'s mother under the medical exception to the hearsay rule and by instructing the jury that those statements could be considered by the jury as substantive evidence. Based upon the alleged errors, defendant asks this court to reverse his convictions outright or to reverse the convictions and remand for a new trial.

¶ 24                          A. Sufficiency of the Evidence

¶ 25            Defendant contends that the accountability language contained within the State's charging instrument locked the State into proving defendant was "acting for another" during the commission of the first degree murder. Defendant contends the State's evidence did not prove that Martin acted as the principal, or that defendant was accountable for Martin's actions.[2] Consequently, defendant challenges his conviction for first degree murder on the grounds that the State's evidence failed to prove the theory of accountability contained in the charging instrument.

¶ 26            Defendant's argument is founded on a faulty premise. It is well established that "[a]ccountablity is not in and of itself a crime." *People v. Stanciel*, 153 Ill. 2d 218, 233 (1992). Defendant does not recognize that the inclusion of accountability language in a charging instrument simply puts defendant on notice that the State may attempt to prove his guilt based on a theory of accountability, but such language is not required (recognizing that a charge based on accountability necessarily flows from the principal crime). *People v. Ceja*, 204 Ill. 2d 332, 361 (2003). The inartful language in the charging instrument in this case did not restrict the State to one approach with respect to proving defendant committed first degree murder, beyond a reasonable doubt. See *id.*

¶ 27            The defense clearly understood that the State may attempt to establish defendant's guilt for first degree murder as either the principal or the accomplice. The record shows that the defense attacked the State's evidence on both fronts. For example, defense counsel's closing argument included this statement, "[The State] [had] to prove beyond a reasonable doubt that

---

[2]Defendant does not argue that the evidence was insufficient to establish defendant acted as the principal.

[defendant] either abetted—either was accountable or that he actually did it, and they have to prove that beyond a reasonable doubt."

¶ 28 Viewed in the light most favorable to the State, the State's evidence established the following uncontested facts: (1) J.M. was four months old at the time of his death; (2) three days before J.M.'s death, Dr. Blechle treated J.M.'s diaper rash at a family clinic and found J.M.'s buttocks to be red and irritated; (3) during this examination, Dr. Blechle observed that J.M. was crying because the diaper rash was painful; (4) after J.M. reached the emergency room, the staff documented fissures and redness around J.M.'s anus that Dr. Blechle did not observe three days earlier; (5) a staff member at the emergency room found a baby wipe in the infant's soiled diaper; (6) defendant was the last person to change J.M.'s diaper before the infant stopped breathing; (7) defendant was the only person present in the apartment with Martin and her child; (8) Martin was petite and weighed 114 pounds and defendant was 5 feet, 10 inches tall and considerably heavier than Martin; (9) J.M. sustained great bodily harm, from multiple blows, as documented by photographs and the autopsy results; (10) the damage to J.M.'s skull was attributable to the application of a significant amount of violent force; (11) an infant could not self inflict the life-threatening injuries documented by the emergency room staff and during J.M.'s autopsy; (12) defendant was not related to the infant; (13) defendant spent time alone with the infant during the time Martin was taking a shower in another room; (14) Martin was checking on the infant every 15 to 20 minutes during the night and early morning hours; (15) Martin was the person who discovered J.M. was unresponsive and not breathing; (16) Martin called 9-1-1; (17) when paramedics arrived, defendant was performing CPR, but was using incorrect techniques; and (18) Martin and defendant gave consistent statements to the emergency staff

13

and/or law enforcement, claiming each person heard nothing, saw nothing, and did nothing to J.M. before J.M. stopped breathing.

¶ 29    Defendant argues on appeal that this jury should have found the State's evidence did not prove defendant was accountable for Martin's actions. We agree that it is difficult to ascertain whether a particular juror signed the guilty verdict after finding defendant acted as the principal or acted as an accomplice to the beating, beyond a reasonable doubt. However, the lack of insight into each juror's view of defendant's role in the infant's death, as a principal or accomplice, does not make this case closely balanced. The case law provides that a "jury need only be unanimous with respect to the ultimate question of defendant's guilt or innocence of the crime charged, and unanimity is not required concerning alternate ways in which the crime can be committed." *People v. Travis*, 170 Ill. App. 3d 873, 890 (1988).

¶ 30    As the court stated in *Travis*, where the legislature "established a number of different conducts for which defendant can be found guilty of that offense. All that is necessary is that the jury is unanimous that he is guilty of the offense, regardless of their agreement on the underlying conduct." *Id.* at 892. Consequently, after viewing the evidence in the light most favorable to the State, and drawing reasonable inferences based on the uncontested facts, the State's evidence was more than sufficient to establish defendant's guilt for first degree murder and/or aggravated battery of a child, based on either one of the two alternative theories of guilt, depending upon each individual juror's interpretation of the evidence.

¶ 31                                B. Rule 431(b)/Plain Error

¶ 32    Defendant next contends that the trial court failed to strictly comply with Rule 431(b) while questioning potential jurors during *voir dire*. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Specifically, defendant asserts that the trial court failed to ask potential jurors (1) whether they

14

accepted the second Rule 431(b) principle (that before the defendant could be convicted, the State had to prove the defendant guilty beyond a reasonable doubt), (2) whether they understood and accepted the third Rule 431(b) principle (that the defendant was not required to offer any evidence on his own behalf), and (3) whether they accepted the fourth Rule 431(b) principle (that the defendant's failure to testify could not be held against him). Defendant asserts that even though the trial court asked the potential jurors whether each juror agreed with the Rule 431(b) principles, this inquiry did not correct the trial court's failure to also ask the potential jurors whether each juror understood and accepted the Rule 431(b) principles.

¶ 33     Defendant acknowledges that this issue has not been properly preserved for appellate review, since he did not object to the alleged error during *voir dire* and did not raise the issue in a posttrial motion (see *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)); *People v. Allen*, 222 Ill. 2d 340, 350 (2006) (an error is not preserved for appellate review unless the defendant objects at trial and includes the error in a written posttrial motion, but defendant asserted, nevertheless, that we should reach the merits of this issue as a matter of first prong plain error because the evidence was closely balanced). Based upon the application of the plain error doctrine, defendant asks that we reverse his conviction and the finding of guilty and that we remand this case for a new trial.

¶ 34     The State argues that no error occurred during *voir dire* because the trial court's questioning of the potential jurors complied with the requirements of Rule 431(b). Alternatively, the State asserts that even if the trial court erred with respect to the Rule 431(b) requirement, defendant forfeited the issue and plain error is not present in this record.

¶ 35     The plain error doctrine is a very limited and narrow exception, allowing a reviewing court to consider unpreserved error if a clear or obvious error occurred and the evidence was closely balanced such that the error alone threatened to tip the scales of justice against the

15

defendant, regardless of the seriousness of the error, or if a clear or obvious error occurred and the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Walker*, 232 Ill. 2d 113, 124 (2009); *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 177-79 (2005); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under either prong of the plain error doctrine, the burden of persuasion is on the defendant. *Walker*, 232 Ill. 2d at 124. If the defendant fails to satisfy that burden, the procedural default of the issue must be honored. *Id.* The first step in any plain error analysis is to determine whether an error occurred. *Id.* at 124-25.

¶ 36    The supreme court rules are not merely suggestions to be followed by the court and the parties if it is convenient to do so. See *People v. Glasper*, 234 Ill. 2d 173, 189 (2009). The determination of whether a supreme court rule has been violated is reviewed *de novo* by the appellate court. See *People v. Wilmington*, 2013 IL 112938, ¶ 26.

¶ 37    Supreme Court Rule 431(b) provides that:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

16

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 38    Under Rule 431(b), a specific question and response process is mandated. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010); *Wilmington*, 2013 IL 112938, ¶ 32. The trial court is required to ask each potential juror whether he or she understands and accepts each of the four principles set forth in Rule 431(b). *Thompson*, 238 Ill. 2d at 607; *Wilmington*, 2013 IL 112938, ¶ 32; *People v. Belknap*, 2014 IL 117094, ¶ 46. "The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *Thompson*, 238 Ill. 2d at 607. "[T]he trial court's failure to ask jurors if they [understand] the four Rule 431(b) principles is error in and of itself." (Emphasis omitted.) *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 39    In the instant case, based upon the Illinois Supreme Court's decisions in *Thompson*, *Wilmington*, and *Belknap*, we conclude that the trial court committed clear error during *voir dire* pertaining to defendant's trial. See *Thompson*, 238 Ill. 2d at 607; *Wilmington*, 2013 IL 112938, ¶ 32; *Belknap*, 2014 IL 117094, ¶ 46. The record is clear that the trial court did not ask the potential jurors whether they accepted the second Rule 431(b) principle (that before the defendant could be convicted, the State had to prove the defendant guilty beyond a reasonable doubt), whether they understood and accepted the third Rule 431(b) principle (that the defendant was not required to offer any evidence on his own behalf), and whether they accepted the fourth Rule 431(b) principle (that the defendant's failure to testify could not be held against him). As our supreme court has indicated, the failure to specifically ask jurors whether they both

understand and accept all four of the Rule 431(b) principles constitutes error. See *Thompson*, 238 Ill. 2d at 607; *Wilmington*, 2013 IL 112938, ¶ 32; *Belknap*, 2014 IL 117094, ¶ 46.

¶ 40 In addition to asking potential jurors whether they agreed with the Rule 431(b) principles, as the trial court did in the present case, the trial court must also ask potential jurors whether each juror understands the Rule 431(b) principles. See *Wilmington*, 2013 IL 112938, ¶ 32 (stating that the trial court's failure to ask potential jurors whether they understood the Rule 431(b) principles was error in and of itself). In this case, the trial court failed to ask the potential jurors whether they understood and accepted all four of the Rule 431(b) principles. This failure constituted clear error for purposes of the plain error doctrine. See *Thompson*, 238 Ill. 2d at 607; *Wilmington*, 2013 IL 112938, ¶ 32; *Belknap*, 2014 IL 117094, ¶ 46.

¶ 41 Having concluded that clear error occurred, we must determine whether the evidence was closely balanced, as defendant suggests, thereby relieving defendant of the consequences of forfeiture due to the first prong of plain error. When determining whether the evidence the trier of fact received was, in fact, closely balanced, a reviewing court "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of [the evidence] within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. A reviewing court's inquiry also "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 42 Here, the State charged defendant with first degree murder pursuant to section 9-1(a)(2) of the Criminal Code of 2012. This section provides that a person commits first degree murder if, in performing the acts which caused the death, "he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2012). As stated above, we conclude the evidence was sufficient to prove defendant's guilt

18

because the unanimity of the jury is not required concerning alternate ways in which the crime can be committed. *Travis*, 170 Ill. App. 3d at 890. Again, for purposes of a closely balanced determination, it is impossible to determine whether the jury concluded defendant's actions made him the principal or a partner in the first degree murder. Therefore, we address whether the evidence was closely balanced pertaining to each one of the two alternative theories and conclude the evidence was not, in fact, closely balanced based on either alternative theory.

¶ 43        Our analysis is guided by the rationale employed by our supreme court's decisions in *Naylor* and *Sebby*. *People v. Naylor*, 229 Ill. 2d 584 (2008); *Sebby*, 2017 IL 119445. Both the *Naylor* and *Sebby* decisions provide pertinent examples of what closely balanced evidence looks like in the context of plain error.

¶ 44        In *Naylor*, two officers and the defendant presented credible but conflicting versions of events, and no extrinsic evidence existed to corroborate or refute either story. *Naylor*, 229 Ill. 2d at 606-08. The court recognized that the defendant's testimony was credible in that it was consistent with much of the officers' testimony and the circumstances of the defendant's arrest. *Id.* at 607. The defendant's testimony, if true, would render the defendant innocent of the crime charged. See *id.* Thus, the trial court's finding of guilt in that case necessarily involved the court's assessment of the defendant's credibility and the court's assessment of each officers' credibility. *Id.* The court ultimately held that the evidence was closely balanced under plain error because the case turned on a credibility contest. *Id.* at 608.

¶ 45        The nature of the State's evidence in this case makes *Naylo*r distinguishable. This case contains *extensive* uncontradicted extrinsic physical evidence that J.M.'s injuries resulted from forceful blows that could not be attributed to the infant's conduct. However, the jury received

extrinsic evidence that negated Martin's and defendant's contention that the infant's injuries may have been self inflicted.

¶ 46         Recently, our supreme court issued a decision in *Sebby*, 2017 IL 119445. Like *Naylor*, the *Sebby* court was faced with testimony establishing two competing, but equally plausible, versions of events. *Id.* ¶¶ 61-63. Neither version of the events was corroborated by extrinsic evidence. *Id.* ¶ 63. The *Sebby* court emphasized that the evidence in that case must be viewed as closely balanced because the case boiled down to a credibility contest, since neither party's version of events could be characterized as "fanciful." *Id.* ¶¶ 61, 63.

¶ 47         According to defendant's prearrest statement to law enforcement, neither adult present in the apartment harmed J.M. Taken to its logical extreme, defendant's exculpatory statement to the police suggested that J.M. spontaneously incurred the multiple life-threatening injuries depicted in the photographs. Needless to say, the jury did not receive any extrinsic evidence supporting the defense's theory that spontaneous injuries were even plausible, let alone more plausible than the opinion testimony concerning the cause of death from the State's expert witness.

¶ 48         Applying a common sense evaluation of all of the evidence presented to this particular jury, as we are required to do, the explanation defendant provided to law enforcement was not only contrary to common sense but was utterly preposterous and implausible in light of the extrinsic evidence this jury received. Therefore, the case law defendant urges this court to follow does not apply because this jury did not have *two* plausible theories to consider, one offered by the State and the other plausible theory offered by the defense.

¶ 49         For these reasons, we conclude this case was not closely balanced and plain error is inapplicable. Therefore, we conclude defendant's forfeiture of the Rule 431(b) deficiencies should be honored.

¶ 51    Next, defendant contends that defense counsel was ineffective for failing to file a motion seeking to redact the portions of defendant's videotaped interview in which meaningful conversation between defendant and the detectives ground to a halt. Defendant correctly asserts that criminal defendants are guaranteed the right to effective assistance of counsel under the United States and Illinois Constitutions. U.S. Const., amends VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). To show ineffective assistance of counsel, a defendant must show that counsel's performance was so deficient that it was unreasonable and that counsel's deficient performance prejudiced defendant. *Strickland*, 466 U.S. at 687. Generally speaking, counsel's decision regarding whether or not to file a motion to suppress is "a matter of trial strategy which will be accorded great deference." *People v. Wilson*, 164 Ill. 2d 436, 454-55 (1994). Here, defense counsel's failure to file a motion to suppress certain portions of defendant's interview did not result in ineffective assistance of counsel because defense counsel's decision was a matter of trial strategy.

¶ 52    During closing arguments, defense counsel referenced the conversations and behaviors that occurred during the contested portions of the videotaped interview. Specifically, defense counsel stated:

"They take him down to the police station and leave him there after he has been there, and they use all of their techniques that they can use. They are more educated. They are more experienced. They have read books. They know how to put the person where they do, try the games that they think they can do so that they will try to get information which they believe is true. Listen to that. My client didn't get up in their face. He kept on

21

saying, 'I don't know.' 'I don't know.' They asked him about hypothetical [*sic*] and maybe this, but 'I don't know.'

Now, he's—has a tenth-grade education. They tried to break him down. He's not some con artist. He did that because he was being forthright and truthful."

¶ 53 Defense counsel's comments demonstrate that counsel was using the contested portions of the interview to highlight and disparage law enforcement's usage of interrogation techniques, while simultaneously painting defendant as calm, forthright, and truthful. Admittedly, as defendant contends, the interview in question shares some characteristics of the interview reviewed by this court in *People v. Hardimon*, 2017 IL App (3d) 120772 (holding that defense counsel was ineffective for failing to move to redact certain portions of the defendant's videotaped interview because the comments of the investigating officers served to prejudice the defendant). However, unlike this case, there was no evidence in *Hardimon* that counsel for the defendant utilized the contested portions of the defendant's interview to craft an argument.

¶ 54 Moreover, "statements made by an investigating officer during an interview with the suspected defendant are admissible if they are necessary to demonstrate the effect of the statement on the defendant or to explain the defendant's response." *Id.* ¶ 35. We find that even if defense counsel moved for suppression, defendant's entire interview would have been admitted as relevant and probative. We cannot say that the investigating officers' statements rose to the same prejudicial level as the statements described in *Hardimon*, thus mandating a finding of ineffective assistance. *Id.* ¶¶ 34-37. Defense counsel was not ineffective in this case.

¶ 55 D. Hearsay Statements

¶ 56 Finally, we address defendant's contention that the trial court erred by admitting certain hearsay statements from Martin based on the medical treatment exception to the hearsay rule.

22

Defendant asserts that the trial court erred by instructing the jury that it could consider these statements as substantive evidence. However, defendant concedes that while defendant objected to the admissibility of these statements during the trial, he did not file a posttrial motion preserving this issue. Defendant seeks to advance this issue on plain error grounds by claiming the evidence was closely balanced. This court has already determined that the evidence in this case was not closely balanced; thus, defendant's argument based on plain error fails, and we conclude defendant forfeited this issue on appeal. *Enoch*, 122 Ill. 2d at 186-87.

¶ 57                             III. CONCLUSION

¶ 58        The judgment of the circuit court of Rock Island County is affirmed.

¶ 59        Affirmed.

¶ 60        PRESIDING JUSTICE CARTER, dissenting:

¶ 61        I respectfully dissent from the majority's decision in the present case. I would conclude that defendant's convictions have to be reversed and that the case has to be remanded for a new trial because of the Rule 431(b) error that occurred. To reach that conclusion, I would find, contrary to the majority's analysis, that the evidence in this case was closely balanced and that the first prong of plain-error review applies to the Rule 431(b) error.

¶ 62        In my opinion, the majority fails to recognize that although the evidence was overwhelming that J.M. was battered and murdered, it was closely balanced as to whether defendant had committed, or was accountable for the commission of, the underlying act of beating J.M. Defendant and Martin were the only two people present when the crimes were committed, and there was some evidence from which the jury could have concluded that defendant had committed the crimes alone, that Martin had committed the crimes alone, or that defendant and Martin had committed the crimes together. While the majority seems to suggest

23

that defendant must have been the person who had beaten and killed J.M. because Martin was too small to inflict such severe injuries, the State's forensic pathologist made no such conclusion; nor was it determined whether J.M.'s injuries were caused by a hand or a foot, by a blunt instrument, or by J.M. being struck against some object.