2025 IL App (2d) 240120-U
No. 2-24-0120
Order filed March 21, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-CF-2017 |
| | ) | |
| SERGIO VARELA, | ) ) | Honorable Elizabeth K. Flood, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the circuit court is affirmed; defendant was proven guilty of aggravated criminal sexual abuse beyond a reasonable doubt and defense counsel did not provide ineffective assistance of counsel.

¶ 2    Defendant, Sergio Varela, appeals his convictions of two counts of predatory criminal sexual assault (720 ILCS 5/11-1.40(a)(1) (West 2020)) and aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). He contends that the evidence at trial was insufficient to support his conviction of aggravated criminal sexual abuse beyond a reasonable doubt and that defense counsel was ineffective by failing to move to redact portions of defendant's interrogation video. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On December 2, 2021, defendant was charged with, *inter alia*, two counts of predatory criminal sexual assault (PCSA) (*id.* § 11-1.40(a)(1)) and aggravated criminal sexual abuse (*id.* § 11-1.60(c)(1)(i)). As relevant to this appeal, the charge for aggravated criminal sexual abuse alleged that defendant committed an act of sexual conduct with K.M. when he "rubbed his body against the body of K.M.," and the PCSA charges alleged that defendant placed his hand on, and his finger in, K.M.'s sex organ.

¶ 5     On November 13, 2023, the case proceeded to trial. K.M. testified that she was 14 years old at the time of trial. When she was 7 years old, she shared her family's house with defendant and his family. During that time, K.M. returned from school one afternoon, and her cousin, Y.M., and another cousin were upstairs. She began crying on the living room couch because she was lonely. While she was crying, defendant came downstairs with a beer and approached K.M. He spoke with her, sat down on the couch next to her, had K.M. sit on his lap, and touched the outside of her "private area" that she uses to "pee," under her clothes and underwear. During this encounter, K.M. testified she was facing away from defendant, and he did not rub his physical body against her, only his hand. Defendant eventually stopped and left, and K.M. contacted her sister, Karime Agapito, and waited for her mother, Maria Elena Tellez, to come home.

¶ 6     Y.M. testified that she was 18 years old at the time of trial. Her mother was married to defendant, and he lived with Y.M. when she was between the ages of 8 and 16. During this time, Y.M. stated that defendant touched her over and under her clothes in her private area she used to pee. Y.M., initially, reported that defendant only touched her over her clothes, but she later indicated that both occurred, and she was too scared to tell this to interviewers. Y.M. asserted that defendant touched her inappropriately more than one time and, eventually, he ceased touching her

when she was around 11 or 12 years old. Y.M. recalled that he told her not to tell her mother about these incidents. Some of these encounters between Y.M. and defendant happened when K.M. was in the house; however, Y.M. and K.M. did not discuss with each other their interactions with defendant, as they were not close. Y.M. learned of K.M.'s allegations against defendant two years prior to trial, when the Department of Children and Family Services (DCFS) notified her about reopening her prior case against defendant.

¶ 7    Agapito testified that defendant and his family lived with her family seven or eight years prior to trial. This arrangement concluded after Agapito received a text message from K.M. stating that a man inappropriately touched her. Agapito called her mother regarding this message.

¶ 8    Tellez testified that she knew defendant as the partner of her husband's family member. She recalled a time defendant lived with her and her family for a short period. On the last day defendant lived with her family, she spoke with Agapito and K.M., which prompted her to return home. Tellez spoke to K.M., and based on her account, defendant was not allowed to live with her family anymore. Tellez did not contact police for fear of DCFS involvement and concerns about defendant's daughter.

¶ 9    Officer Ultan Gallagher testified that he responded to a call regarding a suicidal juvenile on September 8, 2021. Gallagher met with K.M. and, ultimately, referred her case to the Kane County Child Advocacy Center (CAC) because she was having suicidal thoughts pertaining to a time when she was inappropriately touched by an adult male. Additionally, she reported instances of school bullying.

¶ 10    Nurse practitioner Heather Sharp testified that she examined K.M. on November 9, 2021. K.M. had a "normal exam," meaning, there were no abrasions, tears, redness, or anything abnormal. Sharp noted, however, this did not rule out the possibility that K.M. had been abused.

¶ 11    The State introduced People's exhibit No. 1, the CAC interview between investigator Kasandra Osorio and K.M. The video related that when K.M. was about seven years old, a man molested her; she did not know his name, but he was like a family member. Regarding the incident, K.M. stated that after she and her cousin returned home from school, she went into the living room and her cousin went up to her room. While in the living room, K.M. did homework until she became bored, then she started crying because she was lonely. Thereafter, a "drunk" man entered as he was leaving for work and saw K.M. crying. The man indicated that he wanted to make K.M. feel better. K.M. started to get up from the couch but the man grabbed her and pulled her onto his lap. K.M. described that she was on the man's lap, facing away from him, and he was holding her to prevent her from moving. During this encounter, the man touched her on her private part she uses to pee for 5 or 10 minutes. K.M. stated that the man slid his hand under her shorts and underwear to touch her on the inside of her private part. When K.M. was asked if the man did anything with his body, she cradled her arms and indicated that the man was moving like how someone "carr[ies] a baby[.] Like, he was sort of doing that. He was moving, like, forward and downward." K.M. also relayed that the man told her not to tell anyone about the encounter. He then extricated his hand and left. K.M. stated that, after the encounter, she contacted her sister and was glad that her sister believed her because "I would always lie as a child." K.M. noted that, after the incident, the man was kicked out of the house.

¶ 12    Thereafter, CAC investigator David Smith and detective Sandra Navarette testified that they interviewed defendant on September 21, 2021. Smith was the lead investigator, but Navarette conducted the interview as she and defendant both spoke Spanish. The video recording and translated transcript were provided to the jury (People's exhibit Nos. 2 and 3, respectively). During the interrogation, defendant began by describing his current living situation, his personal

information, and his family. Eventually, defendant discussed his past living situation and brought up living with his family and K.M.'s family. Detectives then explained to defendant that they were interviewing him because K.M. indicated to police that he inappropriately touched her during the same period that Y.M., previously, complained that defendant inappropriately touched her. The detective alleged that defendant originally lied when he was first questioned about Y.M.'s outcry of inappropriate touching. They stated that, because K.M. was "really struggling with what happened," and because she was "very truthful" and "very believable," officers now believed Y.M. The detectives conveyed that they knew defendant was lying "about what happened with the other girl, with your stepdaughter too." They opined that defendant was single and had an opportunity to touch both girls but has since "changed and not continued that bad behavior." When defendant was asked if he touched the girls, he replied "No."

¶ 13    Thereafter, defendant described his version of the incident with K.M. Defendant noted that he and his family lived on the second floor of a house, while K.M. and her family lived in the basement and first floor of the same house. One day, before leaving for work, defendant went downstairs to the first floor and saw K.M. crying on the couch. She stated she was crying because was scared and alone. Defendant told K.M. to "calm down" and "stay with the other kids." Defendant denied hugging K.M. or otherwise consoling her. Defendant then claimed he left for work. Thereafter, defendant and his family were told to leave the house and find new accommodations. Defendant noted that the reason he was "thrown out" was because K.M. claimed that he touched her. However, defendant stated he did not sit on the couch by K.M., touch her, pull down her underwear, put his mouth on her vagina, put his penis in her vagina, or rub himself against her while clothed. The detectives questioned defendant about why, if he did not touch K.M., would have moved and not defended himself against these allegations. Defendant believed

that K.M.'s family influenced her into making allegations against him because the two families did not "live well together." The detectives alleged that it was "impossible" for K.M. to parrot allegations her family manufactured "perfectly" and with as much detail as she did.

¶ 14    Navarette and Smith indicated that they did not believe defendant's story, as K.M. did not fabricate her allegations, did not have a motive to lie, and did not have "something against [defendant]." However, defendant, again, denied touching K.M. or sitting next to her. The investigators noted that young girls cry a lot and, generally, do not remember what they cry about; however, when a significant event occurs, like being inappropriately touched, that "stay[s] in a child's mind for all their life." The detectives reiterated that there was more than one alleged instance of misconduct against defendant, wherein each girl was unaware of the misconduct that occurred with the other. When defendant was asked if he continued to touch K.M. or if this was a singular occurrence, he responded, "No, not anymore." Thereafter, defendant clarified that he did not touch K.M. at any time. The detectives then concluded that defendant was "the only person not being honest ***."

¶ 15    Navarette and Smith also questioned defendant regarding his independent recollection of the day of the alleged incident. They doubted that defendant would not remember the details of this day with K.M., unless something significant occurred that would trigger his memory. Defendant indicated that he remembered this day with K.M. because he was the only one there when it happened.

¶ 16    Defendant stated that, despite his belief that K.M. was lying, he did not know K.M. to be untruthful. Thereafter, Navarette presented a hypothetical scenario to defendant of a judge reviewing footage of a crying K.M. in her CAC interview. Defendant indicated that a judge would likely believe K.M. over defendant because "she is saying what it is" and "he's watching her cry."

The detectives posited that the judge would believe K.M.'s statements because "that's what happened. And there's two girls." Defendant explained that he believed that K.M.'s family, including Y.M.'s dad, had an issue with him and was improperly reporting him for this crime. Defendant reiterated that he did not touch K.M., but he opined a judge would believe K.M. and her family over him.

¶ 17    During cross-examination of both Smith and Navarette, defense counsel discussed the detectives' biases, motives, and predispositions before interviewing defendant. Defense counsel highlighted instances, especially during Navarette's cross-examination, where she either told defendant that she did not believe his claims or that she believed K.M.'s statements, without having first reviewed her interview footage. Additionally, defense counsel cited Navarette's hypothetical scenario regarding presenting the case to a judge and argued that it highlighted her biased questioning of defendant.

¶ 18    Then, during Smith's testimony, defense counsel sought to cross-examine Smith with his grand jury testimony that allegedly contradicted the transcript from the interrogation. Defense counsel sought to impeach Smith because,

> "[i]t goes to the motivation of this officer to testify falsely and give information that was not—I really think when you get—you *see the whole transcript* and the manner in which what he will characterize as an interview was really an accusatory inter—interrogation, and it goes to motive, interest, bias why this officer —because I know [the prosecutor] has already set him up with respect to his unbiasness [*sic*] where he direct—"

The court did not allow the cross-examination, but did allow defendant to recall Smith in his case-in-chief and admit the grand jury testimony. During his grand jury testimony, Smith erroneously

testified that K.M. stated that defendant's finger went inside her and that defendant admitted to sitting on the couch next to K.M. before the touching encounter.

¶ 19    Thereafter, during closing argument, defense counsel argued that "cagey and evasive" police work is "how innocent people are charged and convicted of crimes they did not commit." Counsel argued at length that Navarette and Smith walked into the interrogation room with preconceived notions about the case and the veracity of the parties. Counsel posited that the officers "ignored [defendant's] repeated denials time and time again." Counsel encouraged the jury to read the interrogation transcript and view the video, asserting that the detectives were not impartial or unbiased. Counsel argued that Navarette had "blinders on" and she "rush[ed] to judgment," and the officers "were doing anything they could to trick [defendant]." In fact, defense counsel asserted that it was "offensive that [Navarette] testified under oath that she was not biased against [defendant]." Regarding Smith, defense counsel highlighted his contradictory testimony between the grand jury and the interrogation transcripts, noting that defendant never claimed to sit next to K.M. and that K.M. never stated that defendant inserted his fingers into her vagina.

¶ 20    On November 16, 2023, after deliberation, the jury found defendant guilty on all three counts. Nearly one month later, defense counsel moved for judgment notwithstanding the verdict, arguing that the State's evidence was insufficient to sustain defendant's convictions and that the interrogation techniques utilized by Navarette and Smith were "interrogation technique[s] that the Appellate Court frowns upon, which leads to coerced and false confessions." After a hearing, the circuit court denied the motion. Thereafter, defendant was sentenced to consecutive terms of six years' imprisonment for PCSA and three years' imprisonment for aggravated criminal sexual abuse. Defendant did not file a motion to reconsider sentence. Instead, this timely appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22     On appeal, defendant argues that (1) he was not proved guilty of aggravated criminal sexual abuse beyond a reasonable doubt, and (2) defense counsel was ineffective for failing to move to redact portions of his video-recorded interrogation. For the following reasons, we reject his arguments.

¶ 23                                    A. Sufficiency of the Evidence

¶ 24     When considering a challenge to a criminal conviction, based on the sufficiency of the evidence, we must review the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). As a reviewing court, it is not our function to retry the defendant or substitute our judgment for the trier of fact; instead, "the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Wright*, 2017 IL 119561, ¶ 70. A conviction will only be set aside on appeal where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 25     Defendant was charged with aggravated criminal sexual abuse. According to section 11-1.60(c)(1)(i) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.60(c)(1)(i) (West 2022)), "[a] person commits aggravated criminal sexual abuse if[] that person is 17 years of age or over and[] commits an act of sexual conduct with a victim who is under 13 years of age." In this context, "sexual conduct" means,

>          "any knowing touching or fondling by the victim or the accused, either directly or
>
>          through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part
>
>          of the body of a child under 13 years of age, or any transfer or transmission of semen by

the accused upon any part of the clothed or unclothed body of the victim, for the purpose of sexual gratification or arousal of the victim or the accused." *Id*. § 11-0.1.

¶ 26 Defendant does not contend that either his or K.M.'s age is at issue. Rather, defendant asserts that the State failed to prove he "placed K.M. on his lap and moved his body" for the purpose of sexual gratification. During cross-examination, defense counsel asked K.M. if defendant rubbed his physical body up against her. She responded, "No." However, during K.M.'s CAC interview, which was played for the jury, she was asked if anything happened with defendant's body (*e.g.*, was "something different," or was he moving or standing still). She responded that defendant was moving during the encounter—she cradled her arms and indicated that the man was moving like how someone "carr[ies] a baby[.] Like, he was sort of doing that. He was moving, like, forward and downward."

¶ 27 We conclude that, based on K.M.'s CAC interview regarding the nature and the circumstances surrounding defendant's touching of her, a rational trier of fact could reasonably infer that defendant rubbing his body on K.M. was for his own sexual gratification. K.M. indicated that defendant moved his body forward and downward, like cradling a baby, while he touched the outside of her vagina. Despite her trial testimony, K.M.'s interview alone was sufficient to prove that defendant rubbed his body against her for his own sexual gratification. See *People v. Delgado*, 376 Ill. App. 3d 307, 311 (2007) (recognizing that the testimony of a single witness, if credible, is sufficient to convict) (citing *People v. Smith*, 185 Ill. 2d 532, 541 (1999)). And, the jury apparently found K.M.'s CAC statements credible, as they credited her statements over defendant's when they convicted defendant on every count. We defer to that credibility determination. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009) (the trier of fact is responsible for weighing the evidence and credibility of witnesses).

¶ 28    Additionally, K.M.'s testimony was, in part, corroborated by her mother and sister. Both testified that K.M. communicated with them after defendant inappropriately touched her. Each also indicated that, immediately after the incident with defendant, the family forced defendant and his family to move out. Moreover, Y.M.'s testimony provided propensity evidence that defendant had inappropriately touched a minor before and in a similar manner to K.M.'s allegations; in fact, Y.M. alleged that defendant touched her while she was living with K.M. and even when she was present in the home. Accordingly, nothing in the record convinces this court that the jury's credibility findings were unreasonable, improbable, or unsatisfactory.

¶ 29    Moreover, the circumstantial evidence viewed in the light most favorable to the State supports defendant's conviction. Defendant asserts that K.M. "did not describe any action that could be reasonably interpreted as being done for sexual gratification." However, we cannot look at the evidence in such a vacuum. Defendant fails to consider that the intent to arouse or gratify sexual desires may be established by circumstantial evidence. *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010). That is, the trier of fact may infer defendant's intent from the nature of his conduct. *Id*. We are persuaded that defendant's act in rubbing his body forward and downward *while* he was holding K.M. on his lap and touching her vagina, supplied the proof of sexual gratification. The evidence does not support that defendant inadvertently or accidentally rubbed his body against K.M. Instead, K.M. described that he rubbed his body against her *while* he was touching her vagina. Considering the evidence in the light most favorable to the State, a rational trier of fact could conclude that defendant's intention was unmistakably for sexual gratification and arousal.

¶ 30    Defendant cites *People v. Currie*, 2023 IL App (2d) 220114, as informative. We are not persuaded. In *Currie*, the defendant was convicted of two counts of PCSA, including one count

where the State alleged that the defendant penetrated J.L.'s vagina with his penis. At trial, J.L. testified that the defendant touched her "bottom," and no other parts of her body, with his "private" part that he used to "pee." *Id*. ¶ 4. J.L. made out-of-court statements indicating that the defendant's privates touched her privates. J.L. indicated that her privates included: (1) her "bottom," (2) " 'another part that you use the bathroom with' that is located 'in the middle of the bottom,' " and (3) her chest. However, J.L.'s statements did not clarify which of her privates the defendant touched. We held that the evidence was insufficient to sustain the defendant's conviction of PCSA by penetrating J.L.'s vagina because she testified at trial that the defendant did not touch her vagina, and her prior statement was ambiguous as to the acts committed. *Id*. ¶¶ 36-37.

¶ 31    *Currie* is distinguishable from the present case. Although K.M. testified at trial, like *Currie*, that defendant did not complete the acts alleged in a charge against him—here, rubbing his body against K.M.—K.M.'s CAC interview was not ambiguous like the out-of-court statements in *Currie*. Here, K.M. stated in her CAC interview that defendant rubbed his physical body downwards and forwards while he held K.M. on his lap and touched her vagina. Unlike in *Currie*, here, there is no confusion or ambiguity as to defendant's actions referenced in K.M.'s out-of-court statements. K.M.'s interview sufficiently described defendant's actions, which constituted the offense of aggravated criminal sexual abuse. Viewed in the light most favorable to the State, we believe the jury could reasonably infer that defendant intended to sexually arouse or gratify himself based on the nature and circumstances surrounding his conduct.

¶ 32                    B. Ineffective Assistance of Counsel

¶ 33    Turning to defendant's second argument, he argues that his trial counsel was ineffective for failing to move to redact portions of his interrogation video. Defendant contends that nearly the final hour of the video recording should have been redacted, where it was irrelevant and

prejudicial, as he did not make any admissions, and the video primarily consisted of the detectives' prejudicial statements expressing doubt as to defendant's denial of guilt. We conclude that counsel's failure to move to redact defendant's interrogation video was a matter of sound trial strategy and, thus, did not amount to ineffective assistance of counsel. Initially, we note that defendant requests only redaction of the interrogation video and not redaction of the transcript translating the interrogation video. Despite any issue of forfeiture, we, nonetheless, choose to address defendant's arguments relating to the interrogation video as also applicable to the transcript because we find these issues inextricably tied, especially considering that the parties stipulated to the truth and accuracy of the transcript. *People v. Dobbins*, 2024 IL App (1st) 230566, ¶ 15. ("[F]orfeiture is a limitation on the parties, not this court, and we may relax the forfeiture rule where we deem it appropriate in the interests of justice.").

¶ 34    Defendant correctly asserts that he is guaranteed effective assistance of counsel under the United States Constitution and Article I, Section 8 of the Illinois Constitution. U.S. Const., amends VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 687-89 (1984). Claims of ineffective assistance of counsel are evaluated under the two-prong test delineated in *Strickland*, 466 U.S. at 687-88. See also *People v. Albanese*, 104 Ill. 2d 504 (1984). Under this test, defendant must show that counsel's performance was so deficient that it fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced defendant. *Strickland*, 466 U.S. at 687. A defendant's failure to establish either prong precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 35    "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42. Whether counsel should have filed a motion to redact portions of a defendant's

interrogation video is generally considered a matter of trial strategy and, thus, accorded great deference. *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 51. "Counsel has the ultimate authority to direct trial strategy and we will generally not sustain a claim of ineffectiveness of counsel based on inadequate trial strategy except where counsel 'entirely fails to conduct any meaningful adversarial testing.' " *People v. Segoviano*, 189 Ill. 2d 228, 248 (2000) (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)).

¶ 36     When reviewing claims of ineffective assistance of counsel, we give deference to the circuit court's findings of fact and make a *de novo* assessment of the legal issue of ineffectiveness. *People v. Nowicki*, 385 Ill. App. 3d 53, 81 (2008). As the facts are not in dispute, our review is *de novo*.

¶ 37     Here, defense counsel's failure to file a motion to redact certain portions of defendant's interrogation did not result in ineffective assistance of counsel, because counsel's decision was a matter of sound trial strategy. The defense strategy was to challenge the bias and prejudices of both Navarette and Smith, while portraying defendant as calm and consistent in his denials of touching K.M. In doing so, defense counsel used the entirety of defendant's interrogation video to show that defendant maintained that he did not touch K.M., while the police officers came into the interrogation and asked questions throughout the interrogation that evinced their prejudices against defendant. Specifically, when defense counsel sought admission of Smith's grand jury testimony, he noted that his strategy was to allow the jury to compare the *entirety* of defendant's interrogation alongside the grand jury transcripts to show that Smith was biased and provided false testimony. Furthermore, in defense counsel's closing argument, he referenced the interrogation video in its entirety to depict defendant as a calm person who steadfastly denied K.M.'s allegations, and was up against biased police officers who repeatedly ignored defendant's statements and attempted to

get an admission through trickery. Defense counsel's comments throughout the trial demonstrated that he was using the entire interrogation video to highlight that the officers were using questionable interrogation techniques—"[t]his type of police work is how innocent people are charged and convicted of crimes they didn't commit."

¶ 38 We find *Dunbar*, 2018 IL App (3d) 150674, instructive. There, the reviewing court addressed whether defense counsel's failure to move to suppress portions of defendant's interrogation video was ineffective assistance of counsel. *Id*. ¶ 51. *Dunbar* held that despite some similarities between the defendant's interview and the interview described in *People v. Hardimon*, 2017 IL App (3d) 120770, defense counsel was not ineffective because counsel's comments illustrated that he utilized the contested portions of the defendant's interrogation to support his trial strategy that the defendant was "calm, forthright, and truthful" in the face of questionable interrogation techniques. *Id*. ¶ 53. As an aside, the court noted that, even if counsel had moved to suppress portions of the interrogation, his arguments would not have been successful, as the contested portions of the interrogation were otherwise admissible. *Id.* ¶ 54. Like the holding in *Dunbar*, defense counsel here had a sound trial strategy that included showing defendant's steadfastness in his denials of touching K.M. in the face of "biased" police officers that used trickery to try and obtain a confession. This was not objectively unreasonable. Moreover, the fact that the statements in *Dunbar* were found to be otherwise admissible does not detract from the court's holding and its applicability to this case.

¶ 39 Defendant asserts that *People v. Davila*, 2022 IL App (1st) 190882, and *Hardimon*, 2017 IL App (3d) 120770, are instructive. In *Davila*, the reviewing court found that the police officers' statements were more prejudicial than probative, where the officers stated that the witness knew the defendant, vouched for the reliability of the witness's identification, and opined that the witness

had no motive to frame the defendant. *Id.* ¶ 54. The court concluded that the officers' statements improperly bolstered the State's case, misled the jury, and usurped the jury's role in determining witness credibility. *Id.* ¶¶ 58, 61. Of note, defense counsel had orally moved to redact several disputed statements from the interrogation video, which was agreed upon, but, nevertheless, still shown to the jury. *Id.* ¶ 59.

¶ 40    In *Hardimon*, the reviewing court similarly found that the defendant's interrogation video should have been redacted because it contained prejudicial statements that:

> "(1) described, in detail, a scenario where the defendant shot the victim because he was afraid; (2) attacked the defendant's character and credibility, which included the State's potential use of the words 'liar,' 'cold-blooded killer,' and 'execute,' at trial; (3) served to bolster the testimonies of the officers and other prosecution witnesses; (4) described the contents of the surveillance video, while inaccurately vouching for the clarity of the video; (5) claimed the case would be easily prosecuted; and (6) indicated the defendant hid in his girlfriend's basement when the police came to arrest him, which indicated knowledge of guilt." *Hardimon*, 2017 IL App (3d) 120770, ¶ 34.

The reviewing court concluded that the officers' statements only served to inflame the passions of the jury and impermissibly bolster the State's case. *Id.* ¶ 37. There was no indication in *Hardimon* that defense counsel had a reasonable trial strategy for failing to redact the interrogation video.

¶ 41    We agree that the interrogation video here shared some characteristics with the interrogation videos described in *Davila* and *Hardimon*. However, this case is distinguishable from *Davila* and *Hardimon* in one significant regard—here, defense counsel had a reasonable trial strategy that required the admission of the entire interrogation video. See *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 53. In *Davila* and *Hardimon*, there was no evidence that defense counsel

utilized contested portions of the interrogation footage to craft a reasonable trial strategy. In fact, in *Davila*, the opposite occurred; counsel sought redaction of several portions of the interrogation and, despite party agreement that redactions would occur, contested portions of the interrogation were still shown to the jury. *Davila*, 2022 IL App (1st) 190882, ¶ 59. Accordingly, we find *Davila* and *Hardimon* inapposite. Overall, we conclude that defense counsel here was not ineffective as his performance did not fall below an objective standard of reasonableness where he demonstrated a sound trial strategy.

¶ 42                          III. CONCLUSION

¶ 43     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 44     Affirmed.