**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210359-U

Order filed December 12, 2023

---

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0359 Circuit No. 17-CF-501 |
| SEAN EVERETT ROGERS, | ) ) ) | Honorable Norma Kauzlarich, |
| Defendant-Appellant. | ) | Judge, Presiding. |

---

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice Albrecht concurred with the judgment.

---

**ORDER**

¶ 1    *Held*: (1) Defendant failed to establish that counsel was ineffective for failing to redact portions of his video recorded interview; (2) the trial court did not err in sentencing defendant to natural life for first degree murder by relying on improper sentencing factors; (3) defendant's extended-term sentence for his lowest class conviction of aggravated battery was unauthorized and is therefore reduced; and (4) defendant was not deprived of his right to a fair posttrial proceeding.

¶ 2    Defendant, Sean Everett Rogers, appeals from his convictions for first degree murder and aggravated battery. On appeal, he argues that: (1) defense counsel provided ineffective assistance in failing to redact portions of his video recorded interview; (2) the trial court erred in relying on

a sentencing factor that was implicit in the offense of first degree murder; (3) his extended-term sentence on the lesser charged conviction for aggravated battery was unauthorized; and (4) cumulative posttrial errors deprived him of his due process right to a fair posttrial proceeding. We affirm defendant's convictions but vacate his extended term sentence for the lowest class conviction of aggravated battery and modify the mittimus to reflect a sentence of five years' imprisonment for that offense.

¶ 3                                   I. BACKGROUND

¶ 4        Defendant was charged by information with one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) and two counts of aggravated battery (*id.* § 12-3.05(b)(1), 12-3.05(f)(1)). Count I alleged that on June 2, 2017, defendant hit Rochelle Davis in the head with a bat resulting in her death and that he did so in an exceptionally brutal and heinous manner indicative of wanton cruelty (see 730 ILCS 5/5-5-3.2(b)(2) (West 2016)). Count II alleged that defendant committed a Class X felony of aggravated battery by striking his 11-year-old son, Daivari Rogers, in the face with a wooden object and fracturing his skull. Count III alleged that he committed a Class 3 felony of aggravated battery by hitting Jobari Torrey on the head with a "bludgeon."

¶ 5        A six-day jury trial commenced on May 24, 2021. Daivari testified that on evening of June 2, 2017, he attended a cookout at his uncle's house. He and his cousin, Jobari Torrey were playing video games. His aunt, Lakeesha Davis, asked him to take a plate of food to his house for his mom, Rochelle. She sent Jobari with him. When the boys arrived, the front door was locked. As Daivari pounded on the door, Jobari noticed defendant standing at the side of the house. Defendant told the boys to go to the back door, so Daivari followed him. Daivari was surprised to see his father there because his mother recently kicked him out. When Daivari tried

2

to open the back door, he blacked out. He did not see anyone coming out of the house as he reached for the door. Daivari woke up three days later in the hospital.

¶ 6        Jobari testified that he walked with Daivari to Rochelle's house that night. They knocked at the front door, but the lights were off. Jobari noticed defendant at the corner of the house. He asked Daivari why his father was there because "he was not supposed to be around." Jobari and Daivari followed defendant to the back of the house. Daivari walked in front, followed by Jobari, and then defendant. As Daivari attempted to open the back door, Jobari observed defendant with a weapon in his hand. He explained: "[A]ll I saw was something impact on my cousin and he fell, and that's when [defendant] charged and attacked me." Jobari believed defendant was holding a wooden weapon. Defendant hit him with it twice, and it broke the second time. When defendant reached for one of the broken pieces, Jobari ran away.

¶ 7        Jobari's mother, Lakeesha, testified that she was Rochelle's sister. On June 2, 2017, she finished work around 2:30 p.m. and stopped at Rochelle's house on her way home. Defendant arrived at some point. He asked to come inside the house, but Rochelle would not let him in.

¶ 8        Lakeesha confirmed that she, Jobari, and Daivari were at her brother's house for a cook-out later that evening. She sent the boys to Rochelle's house with a plate of food. Jobari returned "hysterical." He was crying and bleeding. He told her that defendant attacked both of them and that he ran back to get help. Lakeesha spoke with 9-1-1 dispatch as she walked back to Rochelle's house. She walked around to the back of the house. Once her eyes adjusted to the darkness, she noticed Daivari sitting in the grass by the sidewalk. He asked for help because "his head was bleeding so badly and he was hurt."

¶ 9        Taurean, Rochelle and defendant's oldest son, testified that he came home that evening sometime between 9:30 and 10:30 p.m. to change clothes to go to a club. When he arrived, his

mother was in the living room, and he noticed defendant in the kitchen. As he walked through the hallway, defendant "ducked" into the stairwell between the kitchen and the back door. The kitchen was dark, but Taurean could see defendant's shadow. Taurean went upstairs and changed. On his way out the door, he asked his mother why defendant was there, and she responded: "He's waiting for Ariel [to pick him up]. He knows he can't stay here." Taurean said, "Okay. Do you have your phone?" Rochelle indicated that she did, and he left.

¶ 10     Rhonda Sowards, an emergency room physician, testified that Daivari arrived at the hospital that night with evidence of severe head trauma. He was conscious and able to speak. He told Sowards, "I think a bat hit me." She removed the bandages from his head and noticed a large laceration and deformity to the skull "with very significant swelling." Sowards also treated Jobari. He received staples for a scalp laceration and was discharged. Sowards identified photographs of Daivari's and Jobari's head injuries and testified that they were consistent with injuries caused by a bat.

¶ 11     Paramedic Darwin Burton responded to a 9-1-1 dispatch to Rochelle's house for an assault victim. As he walked through the kitchen, he observed a lot of blood and tissue. He noticed teeth, hair, and bone fragments. In the basement, he found Rochelle covered in a blanket and lying on her back. When he removed the blanket, he observed severe head trauma. Her face was swollen, her eyes were swollen shut and the area around her mouth was difficult to identify. Burton testified: "[T]here was just so much trauma there. It was just like—anatomy recognition would have been very difficult." He assessed Rochelle and pronounced her dead at the scene.

¶ 12     Forensic pathologist, Mark Peters, confirmed that Rochelle died of blunt trauma to the face. He testified that she suffered numerous fractures of the facial bones and her face was "essentially caved in." The trauma to her face caused extensive bleeding and disruption of her

4

airways. Because her nose and mouth were "essentially caved in," Rochelle was unable to breathe. Dr. Peters testified that a wooden baseball bat was consistent with the type of weapon that could inflict the injuries she sustained.

¶ 13        Buccal swabs from defendant's right thumb tested positive for blood. Samples from a broken bat recovered from the scene and the pant legs of defendant's sweatpants that he wore that night also testified positive for blood. Forensic scientist Jennifer MacRitchie testified that the DNA analysis of the blood samples revealed that the swab from defendant's right thumb contained the DNA of a female and Rochelle could not be excluded from the profile. She explained that the DNA profile could be expected to occur in only 1 in 84 sextillion unrelated individuals. MacRitchie also tested a blood sample from the barrel of the broken bat revealed a female DNA profile from which Rochelle could not be excluded. The profile of the DNA found on the bat could be expected to occur in only 1 in 40 nonillion unrelated individuals. MacRitchie further testified that the blood stains from the left front leg and the right back leg of defendant's sweatpants contained a complete female DNA profile from which Rochelle could not be excluded. Again, the profile could be expected to occur in approximately 1 in 40 nonillion non-related individuals.

¶ 14        Detectives Sean Roman and Richard Moritz interviewed defendant at the Davenport police station on June 4, 2017. Detective Roman confirmed that the interview was audio and video recorded. Prior to trial, defendant filed a motion *in limine* asking, among other things, that the trial court bar any irrelevant prior bad acts evidence alluded to during the interview. The State indicated that a portion of the video discussing a prior police investigation would be redacted. The State then explained that the interview also contained a discussion regarding a prior domestic incident, which the State conceded did not exist. It informed the court that no

witnesses would be testifying that there was a domestic violence issue. The prosecutor further stated that she had discussed redacting the reference with defense counsel and the parties agreed to leave it in. The court noted that "defense counsel can use that because I'm assuming it's the police department trying to make the insinuation and [defense counsel] can essentially use that that [*sic*] there was no domestic violence." Defense counsel agreed, stating: "I have not asked for any redactions." The State further acknowledged that the interview contained a "remote" reference to drug use. The prosecutor indicated that the reference had been discussed with defense counsel as well, and the parties decided that it did not need to be removed. Defense counsel agreed, and the domestic violence and drug use references were not redacted.

¶ 15    The two-hour video recorded interview was introduced and played for the jury without objection. At the beginning of the recording, the detectives introduced themselves and stated that they wanted to discuss the incident that occurred at Rochelle's house. Detective Moritz read defendant his *Miranda* rights, and defendant signed the waiver form. Detective Roman then asked defendant to provide his account of what happened that evening. Defendant shook his head and stated that he would never harm his son and that he could not believe Rochelle was dead.

¶ 16    He explained that he saw Rochelle that night at her house around 6 p.m. Someone was texting or emailing her, and she seemed nervous. He asked if he could spend the night, and she said no, she was fine. He left and then returned around 9 p.m. They were going to have sex, but their oldest son, Taurean, came home. Taurean talked to his mom, changed his clothes, and left.

¶ 17    Defendant stated that he grabbed his clothes because he did not want Taurean to see him there. As he stood at the back door holding his clothes, Rochelle started walking toward him. Then some "dude" came up behind her and pushed her, and she fell. Defendant ran. He told the detectives that there were two men inside the house and both had on masks. Based on their body

6

types, he believed he knew their identities. Detective Roman asked for names, but defendant declined.

¶ 18    Defendant continued to explain that one guy had something in his hand and he hit Rochelle. The other guy had a gun. He could hear them slapping Rochelle. At that point, defendant heard his son Daivari, whom he called "Day Day," at the front of the house. He ran and got him. Daivari walked with him to the back yard and headed toward the back door. Defendant was scared so he grabbed his clothes off the dumpster and ran. He went to his friend's house, called for a ride, and ended up in Davenport.

¶ 19    Defendant stated that one of the men "must have come out of the house" and hit Daivari, but he did not see it. He told Detective Roman that it did not occur to him to call 9-1-1 and that he was mad at himself for running. He should have grabbed Daivari, but he was not thinking.

¶ 20    Approximately 26 minutes into the interview, defendant explained that his relationship with Rochelle was good. He encouraged Detective Roman to talk to the family and claimed that they would tell him that he and Rochelle did not argue—that they did not have "that kind of relationship." Detective Roman then asked if anyone "ever got a call from police for domestic." Defendant responded that a call was made one time for a "small little punch."

¶ 21    At the 28-minute mark, the conversation shifted back to the attack at Rochelle's house. Defendant stated that Rochelle was getting texts all day and was scared of something. When defendant left earlier that day, he told her he would be back and she said, "ok." Thinking back, he believed the attackers must have been in the house when he returned at 9 p.m. because he did not hear a door shut.

¶ 22     Approximately 48 minutes into the interview, Detective Roman asked defendant why he was at the hospital in Davenport earlier that day. Defendant said he was dizzy and admitted to using pills and smoking crack cocaine. He stated that his "go to" drug was "weed."

¶ 23     One hour into the interview, the tone changed. Detective Roman firmly reminded defendant that he was being charged with aggravated battery of a child, his son. Defendant asked about Daivari's condition, and Roman replied that he did not have any information. Detective Roman then confronted defendant with allegations regarding Rochelle's death. He stated that he believed the description of "the mysterious two assailants" was a story and pressed defendant to tell him what really happened. Defendant denied hurting Rochelle. Detective Roman told defendant that they had witnesses and he could not continue to deny that he "beat the shit out of her." Defendant again denied any involvement. Roman asked if he was high on crack cocaine, using pills, or using meth. Defendant stated that he was not high and did not have an addiction.

¶ 24     Approximately 1 hour and 32 minutes into the interview, Detective Roman urged defendant to explain what happened, stating "you beat the shit out of her" and it takes a "special kind of evil to do what you did." He stated that he believed defendant was lying to them and he was the "evil dude that did it." Defendant shook his head and said, "no."

¶ 25     Toward the end of the interview, the detectives took turns accusing defendant and telling him they needed an explanation. They accused him of being high or "evil," stating that he should admit that he was high that night because that was the more plausible explanation. Defendant interjected and said, "I'm not gonna say that I was high. That's bullshit." At one point, Detective Roman compared the situation to "ISIS guys out there chopping people's heads off" and "blowing people up" and stated that the public wants to know "what kind of person does that." Defendant remained calm and said, "I'm not saying what you want me to say." At approximately

8

1 hour and 54 minutes, Detective Roman accused defendant of being "an evil son of a bitch" and insinuated that defendant's family thought he was a "monster." Defendant shook his head in disbelief and stated that he was done talking. The detectives left the room. Throughout the two-hour conversation, defendant denied hitting his son and denied beating Rochelle.

¶ 26    On cross-examination, Detective Roman admitted that defendant's story was consistent during the entire interview, that he never confessed, and that he remained calm. Detective Roman also acknowledged that defendant asked about his son's welfare several times and agreed that his concerns were genuine.

¶ 27    Detective Greg Whitcomb testified that Rochelle's phone records showed that Lakeesha texted Rochelle several times that evening. On cross-examination, he confirmed that he discussed the relationship between Rochelle and defendant with Lakeesha. Lakeesha stated that she never saw any signs of physical or mental abuse and that she never observed defendant threaten anyone with a wooden baseball bat.

¶ 28    The State's closing argument discussed the evidence, including defendant's statements during the police interview. In making its case, the State did not reference defendant's admissions of prior drug use or previous domestic disputes with Rochelle.

¶ 29    Defense counsel's closing focused on defendant's version of events as described in the interview. Counsel discussed the video recorded interrogation at length, arguing that defendant's rendition of the attack was the only eyewitness account of the incident and that his story was plausible. Counsel also encouraged the jury to review the entire interview and carefully consider defendant's numerous denials and calm demeanor:

> "And when he was pressured by those statements that he is a drug addict, that he's a monster, that he is—he snapped, and he was a bad person while the entire time he

appeared to be apparently in shock over some of this information that was being told. After all of that, he had the wherewithal to go, no, I'm not telling a different story, because what I was telling you is right, you're not tricking me into saying something that isn't true. You're not tricking me into telling you what you want to hear.

Now I submit to you that during that entire interview, as contentious as it got, Mr. Rogers remained calm and did what any good father would do, he asked about his family. He asked repeatedly about Rochelle. He asked repeatedly about Dayday [*sic*], Daivari. *** He's not a drug addict, he's not a monster. He's been the same Sean Rogers that you saw in the courtroom as he was in that interview. ***"

Later, defense counsel again emphasized: "[S]omeone is calling him a monster, a drug addict, a bad dad, a killer. All the while he remained calm, trying to explain, trying not to get tricked."

¶ 30　　The jury found defendant guilty of first degree murder and that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. The jury also found defendant guilty on both counts of aggravated battery.

¶ 31　　At sentencing, the court considered the presentencing investigation report and six victim impact statements. Neither party presented evidence in aggravation or mitigation. In closing, the State limited its argument to stating that the jury had found the special allegation proven, thus triggering the possibility of a natural life sentence. Defense counsel noted that, because of defendant's age, any sentence would effectively be a life sentence and asked for the minimum.

¶ 32　　In mitigation, the court considered the following:

"Did the defendant's criminal conduct—supposed to consider whether or not the defendant's criminal conduct neither caused nor threatened serious physical harm to

10

another. That does not apply here. Mr. Rogers, your criminal conduct, in fact, caused serious physical harm to Ms. Davis.

The other factor in mitigation is: Did the defendant—that the defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another.

I don't know. I wasn't there. I only saw what the jury saw. ***."

The court then considered the remaining mitigating factors and found that they did not apply.

¶ 33    In aggravation, the court stated:

"The first factor in aggravation: That your conduct caused serious harm applies.

The second one does not, that you did not receive compensation for committing the offense, unless taking her wallet.

You have a history of prior delinquency or criminal activities.

The rest—and the State likes using the sentence is necessary to deter others from committing the same crime.

And the other factor in aggravation that the jury found was that it was wanton cruelty in the manner in which Ms. Davis suffered her death."

¶ 34    After discussing the victim impact statements, the trial court expressed that it was "saddened" for defendant that he lost his children and "saddened" that he lost Rochelle, the only person who stood by him. It then concluded: "It's going to be the judgment and order of the Court—my only option—is to sentence you to natural life in prison, Mr. Rogers." The trial court sentenced defendant to natural life in prison without the possibility of parole for first degree murder, to run concurrently with a 25-year sentence for aggravated battery on count II (Class X felony) and an extended 10-year sentence for aggravated battery on count III (Class 3 felony).

11

¶ 35                                   II. ANALYSIS

¶ 36                               I. Ineffective Assistance

¶ 37          Defendant argues that trial counsel was ineffective for failing to move to further redact

the police interview. Defendant contends that counsel's performance was deficient because his

admissions to prior domestic violence and drug use, as well as extended passages where

detectives suggested he was "evil" or "high" and invoked comparisons to ISIS terrorists, were

irrelevant and prejudicial.

¶ 38          It is well settled that evidence of other crimes, wrongs, or bad acts is admissible if

relevant for any purpose other than to show a defendant's propensity to commit crimes. See

*People v. Chapman*, 2012 IL 111896, ¶ 19; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Moreover,

statements made by investigating officers during an interrogation are admissible if they are

necessary to show the effect of the statement on the defendant or to explain the defendant's

response. *People v. Theis*, 2011 IL App (2d) 091080, ¶ 33. "To necessitate reversal, the other-

crimes [or bad acts] evidence 'must have been a material factor in the defendant's conviction

such that, without the evidence, the verdict likely would have been different.' " *People v.

Patterson*, 2013 IL App (4th) 120287, ¶ 59 (quoting *People v. Hall*, 194 Ill. 2d 305, 339 (2000)).

Stated differently, the evidence "must be so prejudicial that the defendant is denied a fair trial."

(Internal quotation marks omitted.) *People v. Mefford*, 2015 IL App (4th) 130471, ¶ 73.

¶ 39          A defendant's claim of ineffective assistance of counsel is evaluated under the two-prong

test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme

court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Moore*, 356 Ill. App. 3d 117, 121

(2005). Under the *Strickland* test, the defendant must demonstrate that counsel's performance

fell below an objective standard of reasonableness and a reasonable probability exists that, but

12

for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Henderson*, 2013 IL 114040, ¶ 11. "This means the defendant must show that counsel's errors were so serious, and his performance so deficient, that he did not function as the 'counsel' guaranteed by the sixth amendment." *People v. Perry*, 224 Ill. 2d 312, 342 (2007). A defendant's failure to establish either prong precludes a finding of ineffective assistance of counsel. *Henderson*, 2013 IL 114040, ¶ 11.

¶ 40 "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *Perry*, 224 Ill. 2d at 341-42. Generally, whether to file a motion to suppress or redact portions of a defendant's interrogation is considered a matter of trial strategy and accorded great deference. See *People v. Dunbar*, 2018 IL App (3d) 150674, ¶ 51. "Counsel has the ultimate authority to direct trial strategy and we will generally not sustain a claim of ineffectiveness of counsel based on inadequate trial strategy except where counsel 'entirely fails to conduct any meaningful adversarial testing.' " *People v. Segoviano*, 189 Ill. 2d 228, 248 (2000) (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)).

¶ 41 Here, defendant's argument fails because his attorney had a sound strategic reason for allowing the admission of defendant's statements during his interrogation. The defense strategy was to challenge the State's theory that defendant brutally attacked the mother of his children. In doing so, defense counsel used defendant's statements and his demeanor throughout the entire police interview to argue he was not guilty of first degree murder because he cared for his family and he was not violent. Counsel used the interview in its entirety to depict defendant as a calm person who loved his family and continued to deny any involvement in Rochelle's death or the attack on his son. Counsel urged the jury to consider defendant's consistent statements of

innocence even after two hours of intense questioning, name calling, and radical ISIS references in which detectives encouraged him to admit to the crimes. Defendant's demeanor in the video contradicted the State's theory of violent behavior. Thus, we find counsel's use of the entire interview was a meaningful adversarial test of the State's case against defendant.

¶ 42        Defense counsel's strategy to allow the admission of the two-hour interview also permitted the defense to challenge the State's case on the issue of identity. Counsel used the interview to highlight defendant's eyewitness account that Rochelle was attacked by two intruders who pushed Rochelle and hit her with an object. Relying on defendant's statements during the interview brought defendant's account of the attack before the jury without calling him to testify, another sound trial strategy that avoided the risk of defendant making inculpatory statements or the impeachment of his credibility at trial.

¶ 43        Defendant argues that admitting he previously hit Rochelle and had "extensive experience" with prior drug use was highly prejudicial and an unreasonable admission by counsel. However, defendant's and Detective Roman's discussion regarding the domestic incident was brief, lasting only three minutes during a two-hour interview, and defendant acknowledged that there was only one report. Further, the State did not present any evidence of domestic violence at trial nor did it reference a prior domestic incident in closing. As for defendant's prior drug use, defendant admitted to prior drug use during the interview, but he did so in passing. Moreover, he consistently and repeatedly denied being "high" on the night in question. Again, the State presented no evidence at trial suggesting that defendant consumed drugs that night or that he struggled with drug addiction. The State's theory of the case focused on defendant's frustration with Rochelle because she kicked him out and his jealousy that she was texting another man, not allegations of domestic violence or defendant's prior drug use. See

14

*Patterson*, 2013 IL App (4th) 120287, ¶ 59 (reversal is only warranted where evidence of other bad acts was a material factor at trial that influenced the jury's verdict).

¶ 44 Defendant also challenges the detectives' interrogation techniques and their repeated suggestions that defendant was "evil." Statements made by investigators during an interrogation are admissible if they are necessary to demonstrate the effect their statements had on the defendant or to explain the response given. *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35. Here, during closing arguments, defense counsel referenced the detectives' conversations and behaviors during these contested portions of the interview. Specifically, counsel reminded the jury that the detectives referred to defendant as a "monster," a "bad dad," and a "killer." Counsel's comments demonstrate that he was using the detectives' statements during the interview to emphasize and disparage the officers' use of questionable interrogation techniques, while asserting that defendant's responses depicted a good father and a calm, truthful person.

¶ 45 We admit, as defendant argues, that the two-hour video recorded interview in this case shares some characteristics of the interview reviewed in *Hardimon*. See *Hardimon*, 2017 IL App (3d) 120772, ¶ 37 (finding counsel ineffective for failing to move to further redact a recorded interview where officers' comments in the final two-thirds of the video served only to disparage defendant and label him as a "cold-blooded" murderer). However, unlike this case, there was no evidence in *Hardimon* that defense counsel used the contested portions of the defendant's interview to craft a sound trial strategy. Even if counsel had moved to further redact the challenged comments and questions, the interview, as previously redacted, would have been admitted as relevant. See *Dunbar*, 2018 IL App (3d) 150674, ¶ 54 (finding entire video recorded interview would have been admitted as relevant and probative where the defendant did not admit to killing infant even in the face of aggressive interview tactics). We find the comments and

15

techniques described in *Hardimon* much more egregious than the interview tactics employed in the present case. Thus, defense counsel was not ineffective for failing to request additional redactions.

¶ 46        Also, after a thorough review of the trial proceedings, we are confident that none of the suggested redactions would have changed the outcome of defendant's trial. Accordingly, the defendant has failed to establish the second prong of the *Strickland* standard, which requires a showing of prejudice. See *Strickland*, 466 U.S. at 694 (for purposes of the prejudice prong, "reasonable probability" means "a probability sufficient to undermine confidence in the outcome."). Multiple individuals placed defendant at Rochelle's house during or around the time of her death. Defendant's son, Davari, and his cousin, Jobari, testified that they observed defendant outside the house and in the back yard when they arrived to deliver food. Both witnesses testified that defendant attacked them with a bat or a wooden object and forensic evidence revealed that a wooden bat recovered from the scene contained blood from which Rochelle's DNA profile could not be excluded. Evidence further revealed a high probability of Rochelle's DNA recovered from blood stains on defendant's sweatpants and his right thumb. In addition, no other witnesses reported two masked men at the scene that evening. The State's evidence was compelling, and we cannot say that the suggested redactions would have changed the trial's outcome.

¶ 47                         II. Improper Sentencing Factor

¶ 48        Next, defendant argues that the court erred in relying on a sentencing factor that was implicit in the offence of first degree murder when it considered harm to the victim.

¶ 49        Initially, we note that defendant forfeited this argument by not raising it below. See *People v. Estrada*, 394 Ill. App. 3d 611, 626 (2009) ("It is axiomatic that arguments may not

16

be raised for the first time on appeal."). To overcome forfeiture, defendant requests consideration of the issue under the second prong of the plain error doctrine See *People v. Larson*, 2022 IL App (3d) 190482, ¶¶ 32 (relying on factor inherent in the offense as an aggravating factor "impinges upon a defendant's fundamental right to liberty" and is reversible as second-prong plain error). However, the first step in applying the plain error doctrine is to determine if an error occurred. See *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 50        Generally, a factor implicit in the offense cannot be considered in aggravation at sentencing. *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). However, sentencing courts are not obligated to avoid any mention of such factors as if they do not exist. *People v. O'Toole*, 226 Ill. App. 3d 974, 992 (1992). "[T]he severity of the sentence depends upon the *degree of harm* caused to the victim and as such may be considered as an aggravating factor in determining the exact length of a particular sentence, *even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted*." (Emphasis in original.) *People v. Saldivar*, 113 Ill.2d 256, 269 (1986). Sentencing courts may also consider the manner in which the victim died, as well as the circumstances of the offense, "including the nature and extent of each element of the offense as committed by the defendant." (Internal quotation marks omitted.) *Id.* at 268-69. However, the court may not consider the end result—the victim's death—as an aggravating factor where death is an implicit element of the offense. *People v. Dowding*, 388 Ill. App. 3d at 936, 943 (2009).

¶ 51        In determining whether the trial court properly evaluated the aggravating and mitigating factors, a reviewing court should consider the totality of the record, rather than select words or statements by the trial court. *Id.* at 943. "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning." *People v. Bowman*, 357 Ill. App. 3d 290,

17

303-04 (2005). We therefore review the court's sentencing decision for an abuse of discretion. See *People v. Young*, 2022 IL App (3d) 190015, ¶ 19 (declining to apply *de novo* standard of review to argument that trial court applied improper factor at sentencing). When a court has considered an improper factor "[r]emand is unnecessary where a reviewing court can determine from the record that the trial court placed insignificant weight upon the improper aggravating factor." *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 13.

¶ 52        Our supreme court's decision in *People v. Beals*, 162 Ill. 2d 497 (1994) is instructive. In *Beals*, the defendant argued that the court improperly considered that his actions caused death when death was inherent in the offense for which he was convicted—murder. *Id.* at 509. The defendant pointed to the court's statement during sentencing that: " 'In aggravation the first guideline indicated in the statute is "whether the conduct of the defendant caused or threatened serious harm." Well, we all know that your conduct caused the ultimate harm. It caused the loss of a human life.' " *Id.* The supreme court explained that: "The trial court never indicated *** that it 'considered' the victim's death as an aggravating factor justifying an extended-term sentence. Rather, the record suggests that the trial court statement was simply a general passing comment based upon the consequences of the defendant's actions." *Id.* It further determined that, even assuming the statement could be construed as the court considering the death in aggravation, remand was unnecessary because it was evident the court placed little, if any, weight on the improper factor where it relied on other aggravating factors. *Id.* at 509-10.

¶ 53        Here, defendant contends reversible error occurred because "the trial court twice referred to the harm Rogers caused the victim" in sentencing him to natural life for murder. However, as in *Beals*, nothing about the court's comments indicate that it considered Rochelle's *death* as an aggravating factor justifying a natural life sentence. As discussed, a sentencing court may

18

consider the manner and degree of harm caused to the victim in sentencing a defendant. See *Saldivar*, 113 Ill. 2d at 268-69. The nature and degree of the harm to Rochelle was not inconsequential.

¶ 54    Moreover, the court only mentioned the harm caused to Rochelle in discussing factors in mitigation. In aggravation, the court briefly noted that defendant's conduct "caused serious harm" but did not state that it was considering the fact that defendant caused harm *to the victim* as a factor in aggravation. The victim impact statements detailed how defendant's conduct caused emotional harm to his children. Indeed, later in its ruling the trial court noted that defendant lost his relationship with his children. Considering the totality of the court's comments, we cannot say that the court considered Rochelle's death as an aggravating factor.

¶ 55    Even if we assume the trial court considered Rochelle's death as an aggravating factor, it is evident the court placed little, if any, weight on that factor such that remand is not necessary. Specifically, the court found that, based on the jury's finding of exceptionally brutal and heinous behavior indicative of wanton cruelty, the *only* appropriate sentence was a term of natural life imprisonment. See 730 ILCS 5/5-8-1 (a)(1)(b) (West 2016) (if the trier of fact finds beyond a reasonable doubt that murder was accompanied by "exceptionally brutal and heinous behavior indicative of wanton cruelty," the court may sentence defendant to a term of natural life). Accordingly, we conclude that if the court placed any weight on the fact that Rochelle died, it did not result in a greater sentence. See *Beals*, 162 Ill. 2d at 510.

¶ 56                                III. Extended-Term Sentence

¶ 57    Defendant also argues that the trial court erred in sentencing him to an extended-term sentence on count III under section 5-8-2(a) of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-8-2(a) (West 2016)). Defendant acknowledges that the Code of

19

Corrections authorizes extended-term sentencing if the defendant has a prior conviction for an offense of the same or greater felony class within the last 10 years. *Id.* § 5-5-3.2(b)(1). However, he maintains that an extended term only applies to the offense "within the class of the most serious offense of which the offender was convicted[.]" *Id.* § 5-8-2(a).

¶ 58        The State agrees and confesses error. It notes that while an extended-term sentence may be imposed on separately charged, differing class offenses that arise from unrelated courses of conduct, such was not the case here. See *People v. Bell*, 196 Ill. 2d 343, 350 (2001) (establishing that a defendant convicted of multiple offenses may be sentenced to an extended-term sentence on separately charged offenses "that arise from *unrelated courses of conduct*." (Emphasis in original.)).

¶ 59        In this case, the Class X felony aggravated battery (count II) and the Class 3 felony aggravated battery (count III) were related to the same course of conduct, that being defendant's attempt to flee after committing murder. The trial court sentenced defendant to 25 years' imprisonment on count II and an extended term of 10 years on count III. Because both counts of aggravated battery arose from related conduct, defendant was not eligible for an extended term on the lesser charged aggravated battery conviction on count III, and the trial court erred in imposing that sentence.

¶ 60        A reviewing court may modify a sentence ordered in error without remand to the trial court. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 113 (citing *People v. Whitfield*, 217 Ill. 2d 177, 205 (2005)); see also Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). Aggravated battery is a Class 3 felony under section 12-3.05(h) of the Criminal Code of 2012, which carries a maximum sentence of five years when not extended. 720 ILCS 5/12-3.05(h) (West 2016); 730 ILCS 5/5-4.5-40(a) (West 2016). Accordingly, we modify the mittimus to reflect that defendant's

aggravated battery sentence on count III is reduced to five years, to run concurrently with his natural life sentence for first degree murder as ordered by the trial court. See *Robinson*, 2015 IL App (1st) 130837, ¶ 113.

¶ 61                                    IV. Cumulative Posttrial Error

¶ 62        Last, defendant argues that cumulative error deprived him of a fair posttrial proceeding. He argues the court committed reversible error by: (1) refusing to grant a continuance to allow counsel to review the victim impact statements; (2) ruling on his posttrial motion without oral argument from counsel; and (3) denying his request to leave the courtroom during reading of the victim impact statements.

¶ 63        "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). "There generally is no cumulative error where the alleged errors do not amount to reversible error on any individual issue." *People v. Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 64        Defendant first argues that the court committed error by not granting counsel's request for a continuance to review the victim impact statements. A trial court's decision to either grant or deny a continuance is reviewed for an abuse of discretion. *People v Patterson*, 2017 IL App (3d) 150062, ¶ 13. Here, defense counsel asked for a continuance to review the victim impact statements that were received moments before the sentencing hearing. The trial court granted counsel a brief recess to discuss them with defendant. Eight minutes later, counsel returned and stated that he had reviewed the presentencing investigation report (PSI) with defendant and noted that he did not have any further argument. On appeal, defendant is not challenging the

admissibility of the victim impact statements or the PSI. He argues that review of the statements required more time, but the court did not place a time limit on defense counsel's consideration of the statements or his conversation with defendant. Upon returning to the courtroom, counsel did not request more time to review the statements. When asked by the court if there were any additional arguments regarding the PSI, defense counsel replied, "Judge, not before sentencing." Accordingly, we find no error in the trial court's decision to continue with the sentencing hearing.

¶ 65     Next, defendant maintains that the court erred in denying his motion for judgment notwithstanding the verdict without giving defendant the opportunity to present his argument in open court. We disagree. Defendant framed his argument in its entirety when he filed his written motion with the court. In *People v. Withers*, 87 Ill. 2d 224, 230 (1981), our supreme court held that there was no absolute right to argue a motion for directed verdict and that allowing argument on such a motion rested with the discretion of the trial court. *Id.* at 230-31 (reasoning that oral argument on a directed verdict motion was not required because the ground for the motion has already been set out in the statute authorizing the motion). Subsequently, in *People v. Burnett*, 237 Ill. 2d 381, 389-90 (2010), the court held that a defendant had no absolute right to oral argument on a motion to reconsider sentence. *Id.* (citing *Herring v. New York*, 422 U.S. 853, 863 (1975), where the United States Supreme Court indicated that there was no constitutional right to oral argument at any other stage of trial other than final argument or summation at the conclusion of the evidence in a criminal trial). In this case, defendant filed a posttrial motion raising three arguments as to why the jury's verdict should be set aside or, in the alternative, he should be granted a new trial. At the posttrial hearing, the trial court discussed all three reasons and rejected defendant's claims. Given that oral argument on such posttrial motions is discretionary,

22

we cannot say the court abused its discretion in failing to allow oral argument where defendant filed a written motion setting forth his position on each issue.

¶ 66 Finally, we find no merit to defendant's contention that the court committed error by denying his request to leave the courtroom before family members read their victim impact statements. "[B]oth the federal constitution and our state constitution afford criminal defendants the general right to be present, not only at trial, but at all critical stages of the proceedings, from arraignment to sentencing." *People v. Brown*, 2023 IL 126852, ¶ 12 (citing U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. 1, § 8). Although a defendant may voluntarily waive his or her right to be present by consenting to be absent for a portion of the proceeding (*People v Lindsey*, 201 Ill. 2d 45, 56 (2002)), the converse is not true. It has not been established that the ability to waive presence translates to having a *right* not to be present. We find no error in the court's decision to deny his request.

¶ 67 Having found that none of the posttrial errors alleged by defendant constituted reversible error, there is no cumulative error. See *Green*, 2017 IL App (1st) 152513, ¶ 118.

¶ 68                                             III. CONCLUSION

¶ 69 For the foregoing reasons, defendant's convictions and sentences for first-degree murder and Class X aggravated battery are affirmed. Defendant's conviction for Class 3 aggravated battery is affirmed, and the mittimus is modified to reflect a five-year sentence on that count.

¶ 70 Affirmed as modified.